## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————————
)
**ALICE PEAK,**                                     )
                 **Plaintiff,**        )
)
**v.**                                              )
)
**DISTRICT OF COLUMBIA,**                           )
                 **Defendant.**        )
—————————————————————————————)


### PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND
### PRELIMINARY INJUNCTION

Plaintiff Alice Peak respectfully requests a temporary restraining order and preliminary injunction against the Defendant. In support, Ms. Peak submits the attached Memorandum and states as follows:

1) Ms. Peak is the grandmother and guardian of M.P., a special education student in the District of Columbia Public Schools ("DCPS") system.

2) DCPS has acknowledged for several months that M.P.'s school cannot meet his needs.

3) DCPS has convened four meetings since November 7, 2005 to discuss M.P.'s needs, but has failed to determine or even to propose a new, appropriate placement for M.P., and has refused to discuss Ms. Peak's proposed school placement.

4) M.P. has been accepted at Rock Creek Academy, a proper private school placement for him.

5) Ms. Peak filed an administrative "due process complaint" regarding these issues on December 8, 2006. On February 17, 2006, the Hearing Officer adjudicating the case refused to hear the merits, and postponed such a hearing indefinitely.

1

WHEREFORE, Ms. Peak respectfully requests that this honorable Court grant her a temporary restraining order and preliminary injunction ordering the Defendant to take all steps necessary to place and fund M.P. at Rock Creek Academy and to provide him transportation there.

Respectfully submitted,

_____
Douglas Tyrka, #467500
2807 27th Street, N.W.
Washington, D.C. 20008
p. (202) 332-0038
f. (202) 332-0039

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **ALICE PEAK,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **DISTRICT OF COLUMBIA,** | ) |
| **Defendant.** | ) |

_____)

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Alice Peak files this Motion for a Temporary Restraining Order ("TRO") and

Preliminary Injunction ("PI") against Defendant District of Columbia under the Individuals with

Disabilities Education Act ("IDEA") 20 U.S.C. § 1400 *et seq*., and 42 U.S.C. § 1983. Ms. Peak

seeks immediate relief from this Court and requests that this Court order the District of Columbia

Public Schools to fund M.P.'s placement at and transportation to Rock Creek Academy, a private

special education school. By admission of the District of Columbia Public Schools, M.P. is not in

an appropriate school and has not been for months, at least.

**BACKGROUND**

M.P. is a nine-year-old boy who qualifies for services under the IDEA as a child with

mutliple disabilities.[1] See 20 U.S.C. § 1402(3)(A)(defining child with a disability); Exhibit 35 at

1. M.P.'s most recent Individualized Education Program ("IEP") prescribes 29.5 hours per week

of specialized instruction, 1.5 hours per week of counseling, and 1 hour per week of

speech/language therapy. Exhibit 35 at 1.

_____

[1] DCPS initially classified M.P. as learning disabled.  However, from recent evaluations M.P. has been determined
to be emotionally disturbed as well, thus qualifying him as a child with Multiple Disabilities under the IDEA.

M.P., who is currently in the fourth grade, has been attending Malcolm X Elementary School ("Malcolm X"), a DCPS school, since pre-kindergarten.

On April 11, 2003, M.P.'s teacher documented M.P.'s "sudden and disruptive conduct in all classes and his inability to concentrate or produce any acceptable first grade work."  Exhibit 1 at 3. On June 17, 2003, M.P.'s teacher stated that M.P. had "continued his slide 'down-hill,'" and recommended that he "be given social support services for grief and anger management." Exhibit 1 at 3.

Following the 2003-2004 school year, DCPS promoted M.P. to the third grade despite the fact that he could not read. Exhibit 5 at 1.

DCPS did not evaluate M.P. for special education until 2004.

In 2004, DCPS completed a psychoeducational evaluation, a speech/language evaluation, and a social history of M.P. Exhibits 2-4. On August 12, 2004, DCPS developed an initial IEP for M.P. Exhibits 5-7. The initial IEP classified M.P. as a child with a learning disability and prescribed for him fifteen hours per week of specialized instruction and one hour per week of speech and language therapy. Exhibit 7.

The social history, completed in July 2004, recommended that M.P. receive socio-emotional counseling. Exhibit 4 at 3. Despite that recommendation and the similar recommendation from M.P.'s teacher one year before, DCPS did not prescribe counseling for M.P. until November 2005. Exhibit 1 at 3; Exhibit 4 at 3.

The psychoeducational evaluation, completed in July 2004, recommended that M.P. "be referred for an [occupational therapy] evaluation." Exhibit 2. DCPS did not perform an occupational evaluation of M.P. until December 2005.

2

A Counselor Observation form from June of 2005 documented numerous incidents of inappropriate behavior by M.P. during the 2004-2005 SY, including excessive yelling and screaming in the classroom, defiance of school rules, general unruliness, frequent movement around the classroom, inappropriate contact with other students, pushing and kicking objects, several fights with other students, and removal from the classroom for disrupting the learning process. Exhibit 8.

Ms. Peak has made similar observations. The principal, assistant principal, and school counselor called Ms. Peak to Malcolm X on several occasions during the 2004-2005 SY to address M.P. behavior. Exhibit 11 at 63-70. When Ms. Peak arrived at the school, she routinely discovered M.P. "in the halls running up and down on every floor." Exhibit 11 at 65. Ms. Peak soon learned that several members of the staff at Malcolm X ES shared her concerns, including the assistant principal, Mr. Owens, who stated that he was "having a lot of problems [with M.P.]," and M.P.'s teacher, who told Ms. Peak that M.P. was "running around the halls. When he comes in the morning, he throws his book bag in the classroom and she don't see him no more." Exhibit 11 at 65-66.

M.P. was suspended by the school on several occasions. Exhibit 11 at 66-67. On one of these occasions, a counselor had "dragged him out the school, on the playground" because M.P. had been "running the halls [and] not going to none of his classrooms every day." Exhibit 11 at 67. On another occasion, Ms. Peak discovered a school aide holding M.P. by the hand in the hallway. Exhibit 11 at 68. When Ms. Peak asked why this was necessary, the aide told her that "because he don't want to go to his classroom . . . he sits there with her, all day." Exhibit 11 at 68.

3

Shortly after the conclusion of the 2004-2005 SY, Ms. Peak filed a due process complaint against DCPS ("June complaint"). Exhibit 9. That complaint, filed on June 29, 2005, alleged that DCPS had failed to perform necessary evaluations, had failed to develop and implement an appropriate IEP, and had failed to provide an appropriate school placement, among other things, and requested as relief that DCPS "fund independent clinical, functional behavioral, occupational therapy, and social history evaluations" of M.P. and place him at Ms. Peak's choice of school, among other things. Exhibit 9.

The June complaint was heard on August 23, 2005, and on August 30, 2005 the Hearing Officer dismissed all of Ms. Peak's claims. Exhibit 10. Ms. Peak subsequently challenged that decision with the complaint filed in this court in Civil Action No. 05-1912. Exhibit 14.

After Ms. Peak was denied her request for evaluations and a new IEP and placement to address M.P.'s behavior at the August 23, 2005 hearing, M.P. continued to exhibit near-constant behavioral problems from the very beginning of the new school year. Exhibits 12-13, 15-16, 19-28.

From September 12, 2005 through December 6, 2005, Malcolm X staff documented nineteen M.P.'s behavioral incidents in fifty-eight school days – that is, on almost one-third of the school days. Exhibits 12-13, 15-16, 19-28. These incidents included biting a teacher, threatening classmates with scissors, making animal noises, and threatening to kill classmates and their family members with a gun. Exhibits 12-13, 15-16, 19-28.

On November 7, 2005, DCPS convened a Multi-Disciplinary Team ("MDT") meeting to review and revise M.P.'s IEP. Exhibits 17-18. At that meeting, the MDT discussed M.P.'s severe emotional instability, evidenced by "yelling, screaming . . . physical fights, pushing and kicking chairs [and] books" and "homicidal and suicidal thoughts." Exhibit 17.

4

At the November 7, 2005 meeting, the MDT determined that M.P. needed a full-time, therapeutic special education placement. Exhibit 18. However, DCPS did not propose a specific school placement for M.P. at the meeting. Exhibit 17.

At the November 7, 2005 meeting, the MDT also determined that DCPS needed to conduct a clinical evaluation, an occupational therapy evaluation, and a functional behavioral assessment, the exact same evaluations Ms. Peak had requested – and been denied – at the August 23, 2005 hearing. Exhibit 9-10, 17.

By December 8, 2005, DCPS had not provided Ms. Peak with any of the evaluations determined necessary at the November 7, 2005 meeting, and had not proposed any new placement for M.P. On December 8, 2005, Ms. Peak filed a new due process complaint ("December complaint"), alleging that DCPS had failed timely to perform necessary evaluations, had failed to develop an appropriate IEP, had failed to provide an appropriate education, and had failed to provide an appropriate educational placement. Exhibit 30. As facts, the complaint rested upon the findings from the November 7, 2005 MDT meeting and DCPS' failure to act on those findings. Exhibit 30.

The December 8, 2005 complaint requested as relief that DCPS be ordered to place M.P. at Rock Creek Academy ("RCA"), to fund independent evaluations, and to convene an MDT meeting following the completion of the evaluations. Exhibit 30.

DCPS completed a clinical evaluation on December 1, 2005, an occupational therapy evaluation on December 21, 2005, a functional behavioral assessment on January 4, 2006, and an educational evaluation on January 13, 2006. Exhibits 29, 31, 33, and 34.

The clinical evaluation described M.P. as "a child who is experiencing underlying feelings of depression and anxiety that are complicated with feelings of loss following the death

of his mother, and abandonment by his father." Exhibit 29 at 5. The evaluation determined that,

"[i]n addition to his current Learning Disability classification,…[M.P.] also meets criteria for a

classification of Emotional Disturbance, rendering him eligible for Multiple Disability

Classification." Exhibit 29 at 5.

     The functional behavioral assessment confirmed that M.P. "requires a small-structured

environment with therapeutic intervention and support." Exhibit 33.

     M.P.'s performance on the tests in the educational evaluation placed him in the 4th

percentile of children at his grade level. Exhibit 34.

     On December 22, 2005, DCPS convened a meeting with Ms. Peak to discuss M.P.'s

needs. Exhibit 32. Under the direction of the DCPS Office of the General Counsel, the Malcolm

X staff scheduled the meeting directly with Ms. Peak, despite her counsel's several requests to

DCPS that they schedule meetings through counsel. The Malcolm X staff did not notify counsel

of the meeting, which Ms. Peak attended alone.

     Ms. Peak has no recollection of the December 22, 2005 meeting. Exhibit 41. DCPS notes

of that meeting indicate that, while the recent evaluations were discussed, DCPS did not suggest

any school placement for M.P. Exhibit 32.

     On January 17, 2006, DCPS convened an MDT meeting to review and revise M.P.'s IEP

and to determine an appropriate placement for him. Exhibits 35-38. At that meeting, the MDT

again determined that M.P. needs a full-time, therapeutic special education placement. Exhibit

36; Exhibit 37 at 3; Exhibit 38. There has never been any question that Malcolm X is not such a

placement. However, DCPS continued M.P.'s placement at Malcolm X over the objection of Ms.

Peak's representative. Exhibits 36, 38.

At the January 17, 2006 meeting, Ms. Peak's representative suggested RCA as a school placement for M.P., but DCPS refused to discuss the possibility of RCA as a school placement. Exhibit 38.

Ms. Peak filed a new due process complaint on January 23, 2006 ("January complaint").[2] Exhibit 39. That complaint alleges the failure to perform adequate and timely evaluations, the failure to develop an appropriate IEP, the failure to provide an appropriate education, and the failure to determine an appropriate placement. Exhibit 39. As facts, the complaint relies primarily upon the events of the January 17, 2006 MDT meeting, including the production of an inadequate evaluation at that meeting, and events following that meeting. Exhibit 39.

On February 17, 2006, a due process hearing was initiated regarding the December complaint. Exhibit 42. The hearing had originally been scheduled for February 13, 2006, but had been postponed due to snow. Exhibit 40. Ms. Peak was not present at the hearing because she could not be contacted following very short notice given of the new hearing date.

At the hearing, DCPS submitted as evidence a document it identified as "Resolution Meeting Notes." Exhibit 32. Plaintiff's counsel objected to the admission of the document, and the Hearing Officer initially refused to admit the document because it constituted the record of a settlement discussion, but later reversed that decision. Exhibit 42.

*Sua sponte*, the Hearing Officer suggested the idea that he might order that the December complaint would be "subsumed" into the January complaint, such that both would be heard at the

---

[2] The IDEA, amended effective July 1, 2005, now explicitly allows the filing of "a separate due process complaint on an issue separate from a due process complaint already filed." 20 U.S.C. § 1415(o). In addition to that new provision, the July 1, 2005 amendments included provisions requiring greater specificity in due process complaints and prohibiting a complaining party from raising issues at hearing not pled in the complaint. *See* 20 U.S.C. § 1415(b)(7); 20 U.S.C. § 1415(f)(3)(B).

hearing for the January complaint, which had not yet been scheduled.[3] DCPS supported that idea.

Plaintiff's counsel argued that such an order would postpone Ms. Peak's relief outside the

statutory timelines in violation of caselaw directly on point, and would additionally penalize Ms.

Peak from exercising the right to maintain concurrent IDEA due process complaints explicitly

granted by 20 U.S.C. § 1415(o).

After argument on the preliminary issues, the Hearing Officer refused to hear the merits

of the case. Exhibit 42.

On February 24, 2006, the Hearing Officer issued a Decision and Order ("Decision"). In

the concluding paragraphs, the Decision states:

> The hearing officer declined to conduct a hearing knowing at the beginning that
> evidence not existing at the time the complaint was filed was to be admitted into evidence
> during the hearing.
> The hearing officer noted that all of the violation [sic] alleged against DCPS
> herein were restated against DCPS in the January 25, 2006 complaint.
> In consideration of the foregoing, the hearing officer made the following
> ORDER
> The herein December 9, 2005 Complaint is joined with the Complaint filed in this
> matter January 25, 2006.

Exhibit 42.

On February 24, 2006, after the hearing but hours before the issuance of the Decision,

Ms. Peak, Plaintiff's counsel, and Ms. Peak's independent special education advocate, Sharon

Millis, went together to Malcolm X for a resolution meeting scheduled regarding the January

complaint. Several DCPS employees were present, including Barbara Bailey and Taiya Gregory,

the Malcolm X special education coordinator. Karen Herbert, a DCPS attorney, participated by

telephone.

---

[3] A hearing for an IDEA due process complaint is not scheduled until the end of the 30-day "resolution period" after
the filing. *See* 20 U.S.C. § 1415(f)(1)(B)(ii). From that point, DCPS has 45 days in which to convene a hearing and
issue a decision. *See id.*; 34 C.F.R. § 300.511; D.C. Mun. Regs. tit. 5 § 3030.1. Accordingly, the January complaint
is not due to be decided until April 8, 2006, 75 days from the filing of the January complaint but 121 days from the
filing of the December complaint. *See infra*, Argument I.A.5.

At the beginning of the meeting Plaintiff's counsel notified all present that he was tape recording the meeting. Exhibit 43 at 2. Ms. Bailey immediately objected. Exhibit 43 at 2.

An exchange occurred between Plaintiff's counsel and Ms. Herbert in which Plaintiff's counsel explained that he was recording the meeting because DCPS regularly tries to admit notes of resolution meetings as evidence, and often succeeds. Exhibit 43 at 3. Plaintiff's counsel stated that because of that possibility, Ms. Peak would insist that an absolute record of the meeting be made. Exhibit 43 at 3-4. Ms. Herbert eventually told Ms. Gregory that the decision of whether to proceed was Ms. Gregory's. Exhibit 43 at 5.

All of the DCPS employees left the room to discuss the matter. Exhibit 43 at 5. When they returned, Ms. Gregory read a statement stating that DCPS would not allow the meeting to be recorded. Exhibit 43 at 6. After listening to Ms. Gregory's statement, Plaintiff's counsel began to respond, but Ms Gregory refused to allow any further discussion. Exhibit 43 at 6. The meeting ended shortly thereafter.

Following the receipt of the Decision, on February 27, 2006, Plaintiff's counsel scheduled with the Hearing Officer and DCPS counsel[4] an emergency conference held the morning of February 28, 2006. At that conference, Plaintiff's counsel announced Ms. Peak's intention to file a complaint and TRO motion in federal court, and suggested as an alternative that a hearing on the December and January complaints be scheduled to be held in the next few days, thus obviating the need for a federal court TRO.

DCPS counsel announced her refusal to say anything to Plaintiff's counsel unless on the record. The Hearing Officer refused to consider the requested relief unless it was put into a

---

[4] The attorney at the conference was Tiffany Puckett, the attorney who had participated in the hearing, not Karen Herbert, the attorney from the resolution meeting.

motion. Plaintiff's counsel stated that such a motion would further delay M.P.'s relief, but the Hearing Officer did not change his decision.

The Parties agree that M.P. needs a full-time, therapeutic special education placement. The Parties agree that Malcolm X is not such a placement.

DCPS has never claimed that RCA is not an appropriate placement for M.P. At the August 23, 2005 hearing, at which Ms. Peak had requested the RCA placement, DCPS did not argue that RCA was not appropriate, but that "placement in Rock Creek [was] not justified in this case" because M.P. was "progressing" at Malcolm X. Exhibit 11 at 109-111. DCPS regularly places students at RCA without the need for due process hearings. Exhibit 11 at 100. RCA has agreed to accept M.P. if DCPS funds his placement there. Exhibit 11 at 95.

### STATUTORY FRAMEWORK

The purposes of the IDEA include "ensur[ing] that all children with disabilities have available to them free appropriate public education that emphasizes special education and related services designed to meet their unique needs" and "ensur[ing] that the rights of children with disabilities and parents of such children are protected."[5] 20 U.S.C. § 1400(d)(1)(A). "Free appropriate public education" ("FAPE") means special education and related services provided at public expense, which "include an appropriate preschool, elementary school, or secondary school education," meet state standards, and "are provided in conformity with the individualized education program[.]" 20 U.S.C. § 1415(9).

"The primary vehicle for implementing these congressional goals is the 'individualized educational program' (IEP)." *Honig v. Doe*, 484 U.S. 305, 311 (1988) (interpreting the Education of the Handicapped Act, the predecessor to the IDEA). "Prepared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and

---

[5] "Parent" includes a guardian, such as Ms. Peak. *See* 20 U.S.C. § 1401(23).

whenever appropriate, the disabled child, the IEP sets out the child's present educational

performance, establishes annual and short-term objectives for improvements in that performance,

and describes the specially designed instruction and services that will enable the child to meet

those objectives." *Id.*; *see also* 20 U.S.C. §§ 1401(14), 1412(a)(4) and 1414(d).

To protect the rights of children and parents, the IDEA requires that states[6] receiving

funding under the act establish procedural safeguards, including the opportunity to present

complaints regarding "the identification, evaluation, or educational placement of the child, or the

provision of a free appropriate public education to such child." 20 U.S.C. §1415(b)(6); *see* 20

U.S.C. § 1415(a). Once such a complaint is filed, "the parents or the local educational agency

involved in such complaint shall have an opportunity for an impartial due process hearing, which

shall be conducted by the State educational agency or by the local educational agency." 20

U.S.C. § 1415(f)(1)(A).

However, before the due process hearing occurs, the local educational agency ("LEA")

must convene a "resolution session," attended by "the parents and the relevant member or

members of the IEP Team who have specific knowledge of the facts identified in the complaint,"

at which the parties discuss the complaint, unless the parties agree to waive the meeting. *See* 20

U.S.C. § 1415(f)(1)(B)(i).

"If the local educational agency has not resolved the complaint to the satisfaction of the

parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all

of the applicable timelines for a due process hearing...shall commence." 20 U.S.C. §

1415(f)(1)(B)(ii). The statute does not provide the "applicable timelines," but the federal

regulations and the District of Columbia regulations governing the implementation of the IDEA

do. The District of Columbia regulations require that a hearing be held and a decision issued

---

[6] The District of Columbia is a state for the purposes of the IDEA. *See* 20 U.S.C. § 1401(31).

within 45 days after the end of the 30-day resolution period. *See* D.C. Mun. Regs. tit. 5 § 3030.1. The federal regulations, which have not been amended since the IDEA was amended to add the 30-day resolution period, require that a decision following a hearing be issued within 45 days of receipt of the request for a hearing. *See* 34 C.F.R. § 300.511.

A hearing officer presides over a due process hearing. *See* 20 U.S.C. § 1415(f)(3)(A). The hearing officer must decide the case on "a determination of whether the child received a free appropriate public education." *See* 20 U.S.C. § 1415(f)(3)(E)(i). A procedural violation may only be found to constitute a denial of FAPE if it has impeded the child's right to FAPE, significantly impeded the parent's participation in decisionmaking, or caused a deprivation of educational benefits. *See* 20 U.S.C. § 1415(f)(3)(E)(ii). However, those restrictions do not "preclude a hearing officer from ordering a local educational agency to comply with procedural requirements." *See* 20 U.S.C. § 1415(f)(3)(E)(iii).

The IDEA contains right-to-counsel and fee-shifting provisions. Every party to a due process hearing has the right to counsel. *See* 20 U.S.C. § 1415(h). A parent may also have counsel at a resolution session, though the LEA may only bring an attorney if the parent does so. *See* 20 U.S.C. § 1415(f)(1)(B)(i)(III). A parent who prevails at a due process hearing may be awarded attorneys' fees, including fees related to IEP team meetings, though not including fees for attending a resolution session. *See* 20 U.S.C. § 1415(i)(3).

## TEMPORARY RESTRAINING ORDER AND
## PRELIMINARY INJUNCTION STANDARD IN IDEA CASES

FED. R. CIV. P. 65 governs the entry of a PI or TRO. When deciding a PI or TRO motion, the court "must examine whether: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by

the injunction." *Serono Lab. v. Shalala,* 158 F.3d 1311, 1317-1318 (D.C. Cir. 1998); *see Barton v. Venneri*, 2005 U.S. Dist. LEXIS 9765 ("The standard for a temporary restraining order is the same as for a preliminary injunction.").

"These factors interrelate on a sliding scale and must be balanced against each other. 'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" *Shalala*, 158 F.3d at 1318 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

With regards to the substantive issues – Ms. Peak's likelihood of success on the merits, in other words – unlike in typical judicial review of administrative action, in suits filed under the IDEA following an administrative hearing, the court bases its decision on the preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(C)(iii). The Plaintiff must persuade the court that the hearing officer was wrong, and the court must explain its basis for ruling against the hearing officer. *See Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C. Cir. 1988).

However, in IDEA due process hearings in the District of Columbia, DCPS "shall bear the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student." D.C. Mun. Regs. tit. 5 § 3030.3.

## ARGUMENT

### I.     THERE IS A SUBSTANTIAL LIKELIHOOD OF THE PLAINTIFF'S SUCCESS ON THE MERITS

The Hearing Officer's decision to postpone the hearing on the December complaint – and therefore M.P.'s placement in an appropriate school – contravened all IDEA law and lacked any legal justification. The Hearing Officer should have heard the merits of the December complaint.

On the merits, there is no disagreement that M.P. has needed a new placement and that DCPS has not yet offered one, despite the fact that meetings were convened for that purpose in November 2005, December 2005, January 2006, and February 2006. There is no serious disagreement that RCA, Ms. Peak's proposed school, can meet M.P.'s needs.

Because the Hearing Officer's decision against Ms. Peak is indefensible and because there is no serious dispute regarding M.P.'s needs, Ms. Peak is substantially likely to succeed on the merits of this case.

**A.** **The Hearing Officer Should Have Heard the Merits of the Case at the February 17, 2006 Hearing.**

The Hearing Officer's Decision ordered that the December complaint be joined with the January complaint, and not heard until the hearing on the January complaint. That decision contravenes the statute, regulations, and caselaw, and penalizes Ms. Peak for exercising a right explicitly provided by the IDEA.

**1.** **The Hearing Officer denied Ms. Peak a timely hearing.**

The IDEA provides that "[i]f the local educational agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all of the applicable timelines for a due process hearing...shall commence." 20 U.S.C. § 1415(f)(1)(B)(ii). The statute does not provide the "applicable timelines," but the federal regulations and the District of Columbia regulations governing the implementation of the IDEA do. The District of Columbia regulations require that a hearing be held and a decision issued within 45 days after the end of the 30-day resolution period. *See* D.C. Mun. Regs. tit. 5 § 3030.1. The federal regulations, which have not been amended since the IDEA was amended to add the 30-day resolution period, require that a decision following a

hearing be issued within 45 days of receipt of the request for a hearing. *See* 34 C.F.R. § 300.511. That was clearly the "applicable timeline" contemplated when the statute was amended.

This court has repeatedly enforced those timelines strictly, and held that "the failure to hold a due process hearing, or the failure to provide a written determination in a timely manner after requests for an IEP meeting or a hearing have been made constitutes the denial of a free appropriate public education as required by the IDEA." *Blackman v. District of Columbia,* 277 F. Supp. 2d 71, 79 (D.D.C. 2003) (citing *Walker v. District of Columbia,* 157 F. Supp. 2d 11, 31-32 (D.D.C. 2001)).

Ms. Peak filed her complaint on December 8, 2005. Exhibit 30. Accordingly, she was due a decision following a hearing by February 21, 2005. The Hearing Officer issued his Decision shortly after that, but the Decision specifically states that "[t]he hearing officer declined to conduct a hearing." Exhibit 42 at 2.

The Decision does not specifically indicate when, if ever, the December complaint will be heard. Instead, it states that the December complaint is joined with the January complaint. Exhibit 42 at 2.

Ms. Peak filed the January complaint on January 23, 2006, 46 days after filing the December complaint. Exhibit 39. Now that the Hearing Officer has joined the two complaints, Ms. Peak will not be due a decision until 121 days after she filed the December complaint.

Four months is a very long time for a nine-year-old child in need of intervention, especially in light of the fact that DCPS has conceded for several months that M.P.'s public placement is inappropriate. As the court stated in another decision in *Blackman v. District of Columbia*:

> [T]he failure of the District to comply with its statutory obligations and provide
> appropriate educational placements can have a devastating impact on a child's well-

being....[T]o a young, growing person, time is critical. While a few months in the life of an adult may be insignificant, at the rate at which a child develops and changes, especially one at the onset of biological adolescence with or without special needs like those of our plaintiff, a few months can make a world of difference in the life of that child.

185 F.R.D. 4, 7 (D.D.C. 1999) (internal quotations omitted).

2.    **The Hearing Officer's refusal to hear evidence not existent at the filing of the complaint lacks any support in law.**

Beyond the flat contravention of the law, the Hearing Officer's reasoning for extending the timeline for a hearing is additionally problematic. The Hearing Officer extended the timeline because he "declined to conduct a hearing knowing at the beginning that evidence not existing at the time the complaint was filed was to be admitted into evidence." Exhibit 42 at 2. The Hearing Officer seems to suggest: 1) that a party to a hearing is barred from introducing evidence that came into being after the filing of the complaint; and 2) the proper remedy in such a situation is to postpone the hearing. Neither of those ideas has any support in the statute, regulations, or caselaw.

The IDEA explicitly grants every party to a hearing "the right to present evidence." 20 U.S.C. § 1415(h)(2). The statute states that "[n]ot less than 5 business days prior to a hearing…each party shall disclose to all other parties all evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing….A hearing officer may bar any party that fails to comply…from introducing the relevant evaluation or recommendation at the hearing without the consent of the other party." 20 U.S.C. § 1415(f)(2). The statute also bars the petitioner from raising "issues" at the hearing that were not raised in the complaint. *See* 20 U.S.C. § 1415(f)(3)(B).

The fact that the 5-day disclosure rule requires parties to disclose evaluations "completed by that date" indicates that evidence created long past the filing of the complaint is admissible at

16

hearing. Nothing in the statute, the regulations, or the caselaw suggests that a petitioner cannot present evidence that came into existence after the filing of the complaint. There is no reason to think that this aspect of IDEA hearing procedure would differ from the standard practice in every form of adjudication in every forum – that evidence not existent at the initiation of proceedings is admissible when otherwise appropriate.

The Hearing Officer's reasoning is even stranger given that he explicitly discusses his reliance, when making the decision to postpone the hearing, upon evidence that did not exist at the time the complaint was filed – the "Resolution Meeting Notes" submitted by DCPS.

>  **3.    The Hearing Officer's refusal to hear evidence not existent at the filing of the complaint does not logically support his denial of a hearing.**

Had the Hearing Officer's reluctance to consider evidence created after the filing of the complaint had any legal justification, it still would not have justified his extension of the hearing timelines. The proper procedure would have been to hold the hearing on the December complaint and to bar the admission of that evidence. Because DCPS had already admitted that its placement for M.P. was inappropriate by the time of the filing of the December complaint, there is every reason to think that Ms. Peak would have prevailed at a hearing conducted under that limitation.

Instead of conducting the hearing with an *in limine* ruling, as his own reasoning would have dicated, the Hearing Officer postponed the hearing on the December complaint – and therefore M.P.'s final educational placement – solely because Ms. Peak filed a new complaint before the December complaint had been resolved.

>  **4.    The Hearing Officer's decision to join the complaints does not justify his denial of a hearing.**

The Hearing Officer presented his decision as an order that the two complaints be joined. Exhibit 42. There is nothing in the law that suggests that the Hearing Officer had the power to

17

join the complaints. However, if he did, there is still no justification for the indefinite postponement of the hearing on the December complaint. Upon deciding that the complaints should be joined, the Hearing Officer still had an alternative to postponing the hearing until the hearing on the January complaint: he could have decided both cases now, or at least as soon as possible.

Plaintiff's counsel explicitly proposed that solution at the February 28, 2006 conference, as an alternative to going to the District Court on an emergency basis. Neither DCPS counsel nor the Hearing Officer would hear of it.

> **5.     The Hearing Officer's decision punishes Ms. Peak for exercising a right explicitly granted by the IDEA.**

The IDEA explicitly grants the right to file a new due process complaint prior to the resolution of an existing complaint. Among the July 1, 2005 amendments to the IDEA is 20 U.S.C. § 1415(o), an entirely new provision that states that "[n]othing in this section shall be construed to preclude a parent from filing a separate due process complaint on an issue separate from a due process complaint already filed."

The addition of that provision to the statute along with the other amendments is no coincidence. The addition of the 30-day resolution period extended the effective timeline for a due process hearing decision from 45 days to 75 days. Furthermore, 20 U.S.C. § 1415(f)(3)(B) now explicitly limits the scope of a due process complaint to matters raised in the complaint. The "separate complaint" provision is clearly intended to allow parents to account for changes in circumstances after the filing of a complaint without necessarily amending the original complaint.[7]

---

[7] The IDEA also allows for the amendment of complaints, but an amendment restarts all timelines. *See* 20 U.S.C. § 1415(c)(2)(E).

18

That is exactly what Ms. Peak did. The December complaint alleged, among other things, that DCPS had failed to perform necessary evaluations. Exhibit 30. After the December complaint was filed, DCPS performed some of the evaluations, but Ms. Peak was dissatisfied with one of them. Accordingly, Ms. Peak filed the January complaint, alleging, among other things, that the evaluation was inadequate, a claim she had not made in the December complaint, and therefore could not litigate in a hearing on the December complaint. Exhibit 39. The January complaint also renewed the claim for placement, to account for the possibility that that relief would not be granted at the hearing for the December complaint. Exhibit 39.

Had Ms. Peak not filed the January complaint – as the IDEA explicitly permitted her to do – the Hearing Officer would have been unable to join the complaints and thereby to deny a hearing on the December complaint as scheduled. Therefore, the Hearing Officer's ruling postponing a hearing on the December complaint, and thereby postponing M.P.'s final placement in an appropriate school, punishes Ms. Peak and M.P. for exercising a right explicitly granted by the statute.

**B.    Ms. Peak is Entitled to the Placement of M.P. at Rock Creek Academy.**

Because DCPS has failed for several months to provide M.P. with an appropriate placement, by their own admission, and RCA is a proper placement for M.P., Ms. Peak is entitled to funding for RCA tuition and transportation.

**1.    DCPS has not provided M.P. an appropriate school placement.**

There is no dispute that M.P. needs a full-time, therapeutic special education placement. Exhibits 35-38. Ms. Peak has been requesting such a placement for several months. Exhibits 9, 30, 39. In fact, DCPS' failure to provide such a placement led to the June 2005 complaint, which is now the subject of a case closely related to this one, Civil Action No. 05-1912. Exhibits 9, 14.

19

Though Ms. Peak was denied her request for such a placement at the August 23, 2005 hearing, M.P.'s recent evaluations, completed months or years too late by DCPS, make clear that he "requires a small-structured environment with therapeutic intervention and support." Exhibit 33. At the MDT meetings of November 7, 2005 and January 17, 2006, DCPS admitted that M.P. needs a full-time, therapeutic school placement. Exhibits 17-18, 35-38.

There is no dispute that Malcolm X is not a full-time, therapeutic placement, a small, structured environment with therapeutic intervention and support. DCPS has never contended that to be the case.

Despite that fact, DCPS has failed to determine an appropriate placement for M.P. for several months, and has simultaneously refused to discuss Ms. Peak's proposed placement of RCA. DCPS has continued to ignore its IDEA obligations to M.P. despite the fact that Ms. Peak and/or her representatives have now participated in four different meetings regarding M.P. this school year.

At the November 7, 2005 meeting, the team determined that M.P. needed a full-time, therapeutic placement, but DCPS declined to suggest any options. Exhibits 17, 18. At the December 22, 2005 meeting, DCPS again declined to suggest any school options. Exhibit 32.

At the January 17, 2006 meeting, though DCPS had specifically noted that the purposes of the meeting included to "[d]iscuss placement," DCPS never discussed placement other than to admit that M.P. needs "a full-time therapeutic placement out of general education for students with emotional disturbance." Exhibits 37, 38. DCPS declined to propose a placement, and specifically refused to consider Ms. Peak's proposed placement of RCA. Exhibit 38.

Finally, at the February 24, 2005 resolution meeting, after three due process complaints, two hearings (one of which had been aborted), and the initiation of a district court case, all

regarding M.P.'s school placement, DCPS refused to discuss anything at all with Ms. Peak because Ms. Gregory and Ms. Bailey refused to be tape recorded. Exhibit 43.

In sum, though DCPS admits that their school placement is inappropriate for M.P., in the four meetings DCPS has held this school year DCPS has refused to discuss a new placement for M.P. As a result, he has languished without an appropriate education for several months, by DCPS' admission, and for years, by Ms. Peak's estimation.

> **2.      In the absence of an appropriate public school placement, Ms. Peak is entitled to funding at Rock Creek Academy, an appropriate private school placement.**

The FAPE owed to M.P. by DCPS includes "an appropriate preschool, elementary school, or secondary school education" "provided in conformity with the individualized education program[.]" 20 U.S.C. § 1415(9). "The Act contemplates that such education will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as nonhandicapped children, but the Act also provides for placement in private schools at public expense where this is not possible." *School Comm. of Burlington v. Dep't of Ed. of Mass.*, 471 U.S. 359, 370 (1985).

A child is entitled to funding at a private school "if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence County School District Four v. Carter*, 510 U.S. 7, 15 (1993). Because it is undisputed that Malcolm X is not an appropriate placement, the only question is whether RCA is a "proper" placement.

DCPS has also never disputed that RCA is a proper placement for M.P. They have only resisted a placement at RCA in the past because they claimed that Malcolm X was providing a good education to M.P. Exhibit 11 at 109-111.

At the August 23, 2005 hearing, Keren Plowden, Executive Director for Student Services at RCA, testified regarding the education and services that RCA will provide M.P. if he is placed there. Exhibit 11 at 95-101. Ms. Plowden stated that RCA's unique course of instruction and behavioral modification program would provide M.P. with educational benefit. Exhibit 11 at 97-98, 100-101. More specifically, Ms. Plowden stated that M.P. would be educated by a state-licensed special education teacher in a small, structured environment with comparably-aged peers with similar disabilities. Ms. Plowden testified that DCPS had placed other students with similar needs at RCA in the past. Exhibit 11 at 100.

Because DCPS has failed for at least several months to provide M.P. with an appropriate school placement, Ms. Peak is entitled to funding for M.P. at RCA, a proper private placement, and Ms. Peak is therefore substantially likely to succeed on the merits of this case.

## II.   THE PLAINTIFF AND M.P. WILL BE IRREPARABLY HARMED IF IMMEDIATE RELIEF IS NOT GRANTED

Because M.P. is currently being denied FAPE and because DCPS administrative procedures have proven inadequate to protect Ms. Peak's rights, Ms. Peak and M.P. will be irreparably harmed if the court does not grant immediate relief.

This court has repeatedly held that the denial of FAPE constitutes irreparable harm. *See Massey v. District of Columbia,* 400 F. Supp. 2d 66 (D.D.C. 2005) (finding irreparable harm where DCPS had not offered an appropriate placement); *Blackman v. District of Columbia,* 277 F. Supp. 2d 71, 79 (D.D.C. 2003) ("Indeed, each day a child is denied a free appropriate education by such procedural dereliction of a school system he or she is harmed yet again."); *Cox v. Brown,* 498 F. Supp. 823, 828-29 (D.D.C. 1980) ("[The children] will suffer the irreparable harm of lacking each day of their young lives an appropriate education.").

## III.    THERE IS NO DANGER OF SUBSTANTIAL INJURY TO THE DEFENDANT

If Ms. Peak is granted immediate relief, DCPS will be responsible for the cost of M.P.'s tuition at RCA. This court has found that such a cost is not a substantial injury such that it outweighs the harm to the children in cases like this one.

In *Massey*, the court held that the "unanticipated financial expense" of private school tuition for the student did not outweigh the "serious harm recognized in prior decisions" that results from the denial of FAPE. 400 F. Supp. 2d 66. The court then elaborated on the nature and origin of the harm to DCPS:

> While this Court is sensitive to the budgetary pressures facing any public school district, DCPS cannot be allowed to violate the IDEA and then plead immunity to sanctions because of its financial situation. It is well within DCPS' control to comply with the IDEA and obviate the need for courts to make determinations that will affect DCPS' budget....Where DCPS cannot ensure parents an adequate process, however, it cannot be exempted from compliance because of financial concerns.

*Id.*

In *Cox,* the court suggested that this expense is not a "harm" at all, observing that "[t]he expense that must be borne for this education ultimately by the taxpayers is consistent with the intent that the handicapped children be no less educated and no less sheltered with constitutional protection than those not in need of special services." 498 F. Supp. at 830.

Though a TRO will force DCPS to pay the RCA tuition, that harm is insubstantial in comparison to the harm to M.P. from any further delay in his relief.

## IV.    IMMEDIATE RELIEF WILL FURTHER THE PUBLIC INTEREST

As in the analysis of the balance of harms, this court has repeatedly ruled that the public interest weighs in favor of immediate relief in cases like this one. "Prior decisions by this Court have made clear that the relevant public interest is that of students." *Massey,* 400 F. Supp. 2d 66. "The public interest lies in the proper enforcement of the orders of the Court and the IDEA and

23

in securing the due process rights of special education students and their parents provided by statute. These interests outweigh any asserted financial harm to DCPS." *Petties v. District of Columbia*, 238 F. Supp. 2d 88, 99 (D.D.C. 2002).

A more specific public interest favors immediate relief for Ms. Peak. M.P. has been an extreme behavior problem to everyone at Malcolm X for several months at least. The behavior incident reports attached to this Memorandum and summarized above in Background make it very obvious that not only M.P., but the other students at Malcolm X and the DCPS personnel there, will all benefit from his transfer to RCA.

Because the public interest lies with the student in IDEA cases, the court should order immediate relief for Ms. Peak.

**CONCLUSION**

For the foregoing reasons, this Court should enter a temporary restraining order and preliminary injunction requiring DCPS immediately to take all steps necessary to place and fund M.P. at Rock Creek Academy and to provide him transportation there.

Respectfully submitted,

_____
Douglas Tyrka, #467500
2807 27th Street, N.W.
Washington, D.C. 20008
p. (202) 332-0038
f. (202) 332-0039

24

CERTIFICATE OF SERVICE/RULE 65.1 CERTIFICATE

I hereby certify that on this 2nd day of March, 2006, a copy of the Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and the Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction were hand delivered to counsel for the Defendant.

I hereby certify that on the morning of March 2, 2006, I spoke with Carol Burroughs, counsel for the Defendant in the related case, 05-CV-1912, and discussed the situation in the case with her. We agreed that I would hand deliver all papers to her on March 2, 2006, *en route* to the District Court.

_____
Douglas Tyrka

25

**Key to Exhibits**

Exhibit 1      2002-2003 DCPS Report Card
Exhibit 2      7/12/04 DCPS Psychoeducational Evaluation
Exhibit 3      7/14/04 DCPS Speech and Language Evaluation
Exhibit 4      7/26/04 DCPS Social History Evaluation
Exhibit 5      8/12/04 MDT Meeting Notes
Exhibit 6      8/12/04 IEP Meeting Notes
Exhibit 7      8/12/04 IEP
Exhibit 8      6/05 DCPS Counselor Observation Form
Exhibit 9      6/29/05 Due Process Hearing Request
Exhibit 10     8/30/05 Hearing Officer's Determination
Exhibit 11     8/30/05 Excerpts from Due Process Hearing Transcript
Exhibit 12     9/16/05 Counselor Observation Form
Exhibit 13     9/12/05-10/4/05 DCPS Behavior Incident Logs
Exhibit 14     9/28/05 Federal Complaint in 05-CV-1912
Exhibit 15     10/31/05 DCPS Counselor Observation Form
Exhibit 16     10/05 DCPS Disciplinary Report
Exhibit 17     11/07/05 MDT Meeting Notes
Exhibit 18     11/07/05 Advocate's MDT Meeting Notes
Exhibit 19     11/10/05 ABC Chart
Exhibit 20     11/11/05 ABC Chart
Exhibit 21     11/14/05 ABC Chart
Exhibit 22     11/15/05 ABC Chart
Exhibit 23     11/16/05 ABC Chart
Exhibit 24     11/17/05 ABC Chart
Exhibit 25     11/18/05 ABC Chart
Exhibit 26     11/22/05 ABC Chart
Exhibit 27     11/29/05 ABC Chart
Exhibit 28     12/06/05 ABC Chart
Exhibit 29     12/01/05 DCPS Clinical Evaluation
Exhibit 30     12/08/05 Due Process Complaint Notice
Exhibit 31     12/21/05 DCPS Occupational Therapy Evaluation
Exhibit 32     12/22/05 DCPS Resolution Meeting Notes
Exhibit 33     01/04/06 Functional Behavioral Assessment
Exhibit 34     01/13/06 DCPS Educational Evaluation
Exhibit 35     01/17/06 IEP
Exhibit 36     01/17/06 DCPS Prior Notice
Exhibit 37     01/17/06 MDT Meeting Notes
Exhibit 38     01/17/06 Advocate's MDT Meeting Notes
Exhibit 39     01/25/06 Due Process Complaint Notice
Exhibit 40     02/13/06 Hearing Notice
Exhibit 41     02/23/06 Verified Statement of Alice Peak
Exhibit 42     02/24/06 Hearing Officer's Determination
Exhibit 43     03/01/06 Verified Statement of Jacqueline Donnell