wtk

T6652

1

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF PUBLIC SCHOOLS

OFFICE OF STUDENT HEARINGS

- - - - - - - - - - - x
                      :
In the Matter of:     :
                      :
MICHAEL PEAK          :
                      :
- - - - - - - - - - - x

Washington, D.C.

Tuesday, August 23, 2005

The above-entitled matter came on for

hearing, pursuant to notice.

BEFORE:

SY DuBOW, Hearing Officer

APPEARANCES:

On Behalf of the Student/Parent:

DOUGLAS TIERKA, ESQ.

On Behalf of D.C. Public Schools:

TIFFANY PUCKETT, ESQ.

[TRANSCRIPT PREPARED FROM A TAPE RECORDING.]

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

wtk

2

## C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Tiaya H.Gregory | 9 | 25 | 42 | -- |
| Carolyn Houck | 51 | 57 | -- | -- |
| Alice M. Peak | 63 | 70 | 87 | 89 |
| Karen Clownam | 95 | 101 | -- | -- |

## E X H I B I T S

| STUDENT/PARENT | ADMITTED |
|----------------|----------|
| Nos. 1 through 10 | 4 |

| D.C. PUBLIC SCHOOLS | |
|---------------------|---|
| Nos. 1 and 2 | 4 |

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1          MR. TIERKA: Carolyn, hang up, bye.

2          MS. PUCKETT: She's gone, the little green

3  light's off.

4

5                    ALICE M. PEAK

6  was called as a witness and, having been first duly

7  sworn by the Hearing Officer was examined and

8  testified as follows:

9          HEARING OFFICER DuBOW: Please state your

10  name for the record.

11          THE WITNESS: My name is Alice M. Peak.

12          HEARING OFFICER DuBOW: And your

13  relationship to the Student?

14          THE WITNESS: Grandmother of Michael Peak.

15          HEARING OFFICER DuBOW: Your witness.

16                    DIRECT EXAMINATION

17          BY MR. TIERKA

18      Q   Ms. Peak, is Michael having behavior

19  problems at school?

20      A   Yes, he is.

21      Q   When did you first become aware of these?

22      A   Um--

wtk

1      Q     Approximately?

2      A     --probably about two years ago.

3      Q     Has the school ever called you because of

4   Michael's behavior?

5      A     Yes.

6      Q     This last second half of the last school

7   year, about how often were you being called on

8   Michael's behavior?

9      A     I was called about three or four times.

10  After I got the calls, I started going over there

11  walking the halls.  And the teachers-his teachers

12  would come out and they would talk to me and say,

13  he throw his book bag in class-

14           HEARING OFFICER DuBOW: I don't understand

15  a word you're saying. You're going to have to slow

16  down.

17           MR. TIERKA: Okay.  You're going to have to

18  slow down a little bit.

19           BY MR. TIERKA:

20      Q     Let's start with the first question: So,

21  I'm sorry, you said three or four times over the

22  second half of the last school year?

1       A    Yes.

2       Q    They called you?

3       A    Yes.

4       Q    And I asked you whether the school had

5   contacted you.  Who at the school contacted you?

6       A    Mrs. Jones.

7       Q    And who is she?

8       A    She's some kind of counselor over there.

9       Q    Okay.

10      A    I was asked to come over to the school and

11  I went to the office and I talked to Mr. Kimbell

12  [ph] and Mr. Owens [ph] about Michael.

13      Q    Mr. Kimbell?

14      A    Mr. Kimbell, he's the principal and Mr.

15  Owens's the assistant principal.  And Mr. Owens was

16  saying, I'm having a lot of problems about Michael.

17  And he said I don't want to [Unintell.] and I said,

18  okay, I'm going to come over here and I'm going to

19  walk the halls and catch him.  So, I goes and walks

20  the halls.  He's in the halls running up and down

21  on every floor, from the first floor to the third

22  floor-fourth floor.  And his teacher told me that

wtk

66

1   Michael is running around the halls.  When he comes

2   in in the morning, he throws his book bag in he

3   classroom and she don't see him no more.  So, I

4   catch him in the hall, he walked the hall all the

5   time.

6           So, after that, I took him out in the

7   hallway and I kinda punched him a little bit and

8   then I took him back in the classroom.  Then after

9   that, they called me again and I caught him in

10  there swinging on the posts in the classroom.  And

11  I sit in the classroom for about a minute.  And

12  then I left out.  Soon as I got back across the

13  street, they called me again.  They walked him

14  across the street and told me he was suspended for

15  one day.

16      Q    Now when was this?

17      A    That was back in-before school was let

18  out.

19      Q    Okay.

20      A    I got another phone call.  I was in the

21  community center, where I volunteer at.  And I

22  looked come across the street over there, told me

1    to come and get-Ms. Jones told me to come and get

2    Michael.  As I was coming across, they had dragged

3    him out the school, on the playground.  And I asked

4    her why did they drag him?  Because his clothes was

5    all dirty.  So, she said, he's running the halls,

6    he's not going to none of his classrooms and this

7    is every day.  She said, Ms. Peak, he's going to be

8    suspended for one day.

9         Q    And who was this?

10        A    This was Ms. Jones.

11        Q    Ms. Jones, again?  Okay.  How many

12   times-how often did you go visit the school over

13   the second half of last school year?

14        A    I goes through there all the time, because

15   I live right across the street.

16        Q    All the time-give me some idea how many

17   times per week?

18        A    Well, I go in there maybe every other day,

19   I goes through there.

20        Q    Of those times that you went and visited,

21   how often was Michael running the halls, as you

22   said?

wtk

68

1     A    He runs the halls all the time.

2     Q    So, every time you visited?

3     A    Yes, he'd be in the halls.

4     Q    Now, you went to-well, let me ask you

5 this.  Was that occurring before the January '05

6 IEP meeting?

7     A    That was after the IEP meeting.

8     Q    Okay.  And when you spoke to his teacher

9 about his running in the halls, did she indicate

10 that it was a daily thing or did you talk about how

11 often it was?

12    A    His home room teacher, that's-he never

13 goes to her classroom and he be's with this-she's

14 not a teacher, she's a what they call it-she helps

15 out in the classroom with the teachers.

16    Q    An aide?

17    A    Yeah, she's a aide and every time I sees

18 her, she's got Michael by the hand.  And I said,

19 why he's with you?  She said because he don't want

20 to go to his classroom.  So, he sits there with

21 her, all day.

22    Q    He sits with her.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

wtk                                                              69

1        A    She gets him out the hall and he sits with

2   her.

3             HEARING OFFICER DuBOW: Who?

4             THE WITNESS: Michael.  He sits with the

5   aide.

6             HEARING OFFICER DuBOW: He sits with the

7   AIDE?

8             THE WITNESS:   Yes, her name is Ms. Palmer

9   [ph], he be with Ms. Palmer all day.

             BY MR. TIERKA:

        Q    Out in the hall you said, or-

        A    Out in the hall, he don't come home with

homework and he don't read that well.  And it's a

lot of things.  Michael-Michael, I don't know, when

their mother died-they were doing pretty good

before their mamma died, and after that, two years

ago, then things start going downhill with him.  He

just started acting out.  So, when I was talking to

one of the teachers about, maybe he need a change,

you know.  He need to be-so this is why he was

telling me about the **special-ed--put** him in, the

IEP was going to put **in special-ed.**  So they put

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

1  him in special-ed, and after that, they said he was

2  doing fine.  And I said, well, he's not doing fine

3  at home because I don't never see no homework.  And

4  on his report cards it always say-when they come,

5  you say he's doing fine, but they put stuff on the

6  report card what he done did all through the year.

7  And I-

8      Q    You say they put something on the report

9  card?

       A    Yeah, they writes on the report card what

he's doing-Michael's not doing this; Michael's not

doing that.  And I said, well y'all set up that IEP

say he's doing good.  It's on that-it's written in

his report card what he do all through the school

days.

            MR. TIERKA: I have no further questions.

            HEARING OFFICER DuBOW: Cross

                    CROSS EXAMINATION

       BY MS. PUCKETT:

       Q    Hi, Ms. Peak.  You indicated that his

behavior is a concern at this point, correct?

       A    Yeah.

1          HEARING OFFICER DuBOW: And your position?

2          THE WITNESS: I'm the executive director of

3   student services at Rock Creek Academy.

4          HEARING OFFICER DuBOW: Okay, Mr. Tierka

5   will ask you about Michael.

6                    DIRECT EXAMINATION

7      BY MR. TIERKA:

8      Q    Hi, Ms. Clownam. Is it part of your

9   duties there at Rock Creek, to be familiar with the

    services offered there?

       A    Yes, it is.

       Q    Is it part of your duties to participate

    in admissions decisions for children?

       A    Yes, it is.

       Q    Has Rock Creek accepted Michael for

    admission?

       A    Yes, we reviewed his packet and conducted

    a tour and interview with the Parent.

       Q    I know you have Michael's IEP from January

    '05 there.

       A    That's correct.

       Q    I know it identifies him as LD, but have

wtk                                                                        96

1    you also, well, do you understand him to have

2    behavioral issues, as well?

3        A    I reviewed a psycho-educational evaluation

4    from July 2004; I've also reviewed a

5    speech-and-language evaluation and a social history

6    evaluation from July 2004; and a-

7            HEARING OFFICER DuBOW: Speak up, please.

8            THE WITNESS:  --about--

9            HEARING OFFICER DuBOW: You're going to

     have to speak up.  You're going to have to repeat

     that, we cannot record you, you're too soft.

             THE WITNESS: Okay.

             HEARING OFFICER DuBOW: Repeat what you

     just said.

             THE WITNESS: I said that I have reviewed a

     psycho-educational evaluation, dated July 2004; a

     speech-and-and language evaluation and social

     history evaluation, also dated from July 2004.  And

     I've spoken to the Parent regarding his behavioral

     concerns.

             BY MR. TIERKA:

         Q    So, what is your understanding-I mean, I

wtk                                                                          97

1  understand that the IEP says one thing, but what is

2  your understanding of Michael's needs right now?

3       A    In terms of behavior or in terms of

4  overall?

5       Q    Overall.

6       A    Okay.  I've been reviewing the documents,

7  I've noted that the psycho-educational evaluation

8  recommended an O.T. eval.  I didn't see an

9  occupational therapy on file, so I'm not certain if

that's a service he will or will not need.  The

social history that I reviewed recommended

psychological counseling.  I don't see that as

evident on his current IEP.  So, it appears that

will be a service that he needs.  There was also a

discussion with the Parent of concerns about his

safety in staying on location, and [Unintell.]

behaviors, behavioral program and structure for him

to be successful.

       Q    Does Rock Creek have a behavior

modification program there?

       A    Yes we do.

       Q    Could you tell me something about it?

wtk

98

1    A    Sure, we have a **point-sheet system, a**

2    level system, where everything is **positive**

3    re-enforcement.  Our students have to **ear certain**

4    points throughout the day for following **directions;**

5    for being on location; for completing their work,

6    things of that nature.

7         At they earn points, they move up the

8    level system, so they're rewarded for positive

9    behavior.  It's very structured, it takes every

10   period of every day and it's **communication and**

11   feedback with the Parent daily.  So that **point**

12   sheet goes home, it gets signed and comes **back and**

13   there's a visual graphic organizer in **the classroom**

14   so that the student's understand **how they're**

15   progressing along the behavior **system.  And there's**

16   built-in incentives and rewards **for each level of**

17   points.

18   Q    Do you have a class in **mind for Michael**

19   right now?

20   A    Yes, it would be-as a **program,** when

21   students start with us, we do **some testing,** as

22   well, because we **group our students by** ability, so

wtk                                                                    99

1    he'll **be in a separate reading group based on how**

2    he **tests and how he performs.   But, for the most**

3    part those **classes** are **self-contained.   Ms.**

4    Hookkepple **[ph] is one** of **the teachers is one of**

5    the teachers **for his** age **group.   He might have an**

6    additional **teacher** for **reading, because we only**

7    have two **teachers,** but, **primarily he will be in one**

8    class.

9         Q    Could you tell me **about Ms. Hookkepple's**

     qualifications?

          A    Ms. Hookkepple is **a licensed,**

     special-education teacher.   **She's licensed in D.C.**

     for K through 12.

          Q    How many children **are in that class?**

          A    Well, the class size **[Unintell.]-to-one,**

     however this coming school **year we're not at**

     capacity, so there may be **three or four student**

     total, depending on who shows **up for start of the**

     school year.

          Q    And are the ages **of the other students**

     comparable to Michael's?

          A    Yes.

1     Q   And you **already** said that he'd be **placed**

2  there based on **performance** level?

3     A   He would be **placed** in a reading group

4  based on his reading **level.** They do ability

5  grouping for reading.

6     Q   Rock Creek has a relationship with the

7  District of Columbia Public Schools to accept

8  students from them directly, correct?

9     A   Yes, we do.

     Q   As a part of that relationship—so, just

for brevity, DCPS places children directly to Rock

Creek sometimes, not through a hearing process?

     A   That's correct, through a Notice of

Placement; through a referral and a Notice of

Placement.

     Q   And have you received placements from DCPS

for children similar to Michael?

     A   Yes, we have.

     Q   Based on your **knowledge** of Michael and his

needs and your knowledge **of the** program there at

Rock Creek Academy, is **there** any reason **why** you

think Rock Creek cannot **provide educational** benefit

1  to Michael?

2      A    No, there's not.

3          MR. TIERKA: I have no further questions.

4          HEARING OFFICER DuBOW: Cross

5                  CROSS EXAMINATION

6          BY MS. PUCKETT:

7      Q    His, Ms. Clownam, this is Tiffany Puckett,

8  how are you ?

9      A    Good, how are you?

10     Q    I'm doing fine.  You said you have

11 Michael's IEP, correct?

12     A    Correct.

13     Q    And you are aware that Michael is not 100

14 percent, he's not 100 percent full-time,

15 special-ed, correct?

16     A    Based on the Jan 2005, IEP correct.

17     Q    So, Rock Creek could provide the least

18 restrictive environment for him, correct?

19     A    Well, not that--we are a full-time

20 special-education placement.  But it appears in

21 reviewing the document that it's not complete.  And

22 that Michael may require additional services that

1          HEARING OFFICER DuBOW: I'd want to get, I

2    mean-

3          MR. TIERKA: That's the other attorney, so.

4          HEARING OFFICER DuBOW: Who is the other

5    attorney on this?

6          MR. TIERKA: Stephanie [ph]  She's the one

7    on the disclosures, I'm don't know if she-

8          HEARING OFFICER DuBOW: Okay, but, you

9    know, I come back at 12:00 and we'll see what we

10   can do, okay?

11         MR. TIERKA: I'll call you then, Karen.

12         THE WITNESS: Okay.

13         MR. TIERKA: Thank you.

14         THE WITNESS: Thank you.

15         HEARING OFFICER DuBOW: Nothing further,

16   closing on this case.

17         MR. TIERKA: First, I'd like to run through

18   some of the documents as they relate to many of our

19   claims.  And I'd like to deal with the evaluations

20   first, because I don't think there's any question

21   that Michael is in need of these evaluations.

22   We're requesting that they be independently funded

1   because DCPS has failed to conduct them.  And I

2   don't think DCPS has offered any argument or any

3   explanation for it's failure to do these

4   evaluations.

5          First, the occupational therapy: It's

6   called for very specifically in the

7   psycho-educational that DCPS themselves did.  And

8   that's our Disclosure No. 3, on the last page.  As

9   a matter of fact it's the very last sentence,

10  recommends him for occupational therapy.  And that

11  was back in '04, DCPS has not conducted that

12  evaluation.

13         Similarly, in the IEP notes of August '04,

14  On the third page of the notes at the bottom of the

15  page, it recommends an O.T. evaluation and,

16  furthermore, it says, Ms. Shaw [ph] the

17  psychologist requested that when Michael is taken

18  for his health check-up, Ms. Peak asked for him to

19  be assessed for hyperactivity, thereby identifying

20  his need for an evaluation to get at his

21  hyperactivity.  That evaluation, typically, DCPS

22  likes to do a clinical evaluation and then send

wtk                                                                    106

1    that up to Dr. Taylor-Davis for a diagnosis of

2    ADHD.  However, DCPS—

3           HEARING OFFICER DuBOW: What page is that?

4           MR. TIERKA: It's the third page of the

5    notes from August, '04, from that IEP.  Little bit

past where you are now, I think.  Yeah, Page 2, at

the bottom of the page.  Reports Ms. Shaw, that's

the psychologist who did the psycho-ed, discussing

it.  Also, at the top of that page, it states Ms.

Peak's concerns about his behavior: not turning in

homework; walking the halls; and says, messing with

other kids.

           Furthermore, on his report card, which is

our Disclosure No. 7, the very last page, which has

15   teacher comments.  It specifically addresses in

16   February '05 and May '05, his daily behavioral

17   problems.  In one spot it says daily; another spot

18   it says often.  I don't think there's any question

19   that there are behavioral issues here, which were,

20   of course, confirmed by Ms. Peak's testimony about

21   his suspensions; about being pulled from class;

22   roaming halls, and about the aide just holding his

1    hand outside in the hallway so he was never in

2    class.

3            So, I don't think there's any question

4    here that he needs a clinical evaluation to have an

5    appropriate IEP.

6            Regarding Michael's IEP, well, first off,

7    it's not based on full evaluations and, therefore,

8    cannot be said to be appropriate.  More

9    specifically, it doesn't deal with any of this

10   behavioral issues.  It never addresses it, simply

11   identifies him as LD; does not provide counseling,

12   as recommended in the social history, which is our

13   Disclosure No. 5.  And doesn't otherwise deal with

14   the behavioral issues raised in the report cards

15   at the IEP meetings, and as testified by Ms. Peak.

16           The placement suffers from the same

17   problem and clearly, Michael is not improving

18   according to Ms. Peak's testimony that his grades

19   have not been better; that he can't read; and he's

20   spending all his time roaming the halls.

21           There was some discussion of the—actually,

22   there was a lot of discussion about the June 20

1    meeting.  Obviously, **there's conflicting** testimony

2    **from** Ms. Gregory and **Ms. Houck, regarding**, whether

3    **this** invitation was ever sent.  **However,** Ms. Peak

4    said that on 6/20, Ms. Gregory didn't even know

5    that Ms. Peak had an attorney when she arrived at

6    the meeting.  And that, Ms. Gregory, then, called

7    Ms. Houck right then on the spot.  However, we

8    don't have to necessarily resolve that conflict in

9    testimony, because Ms. Gregory acknowledged that

10   even though it's her policy to send a second

11   invitation if the first one is not is responded to,

12   she did not do so.  Even though it's policy to send

13   a meeting confirmation once a meeting has been set,

14   she did not do so.

15           She testified that the policy was to fill

16   out the form, to check all boxes for everything the

17   meeting will be dealing with and the only box

18   checked on that meeting invitation it says SEP

19   meeting, that's all it says.  It doesn't say

20   anything about placement, but Ms. Gregory admitted

21   that that was specifically the issue that had **been**

22   raised by **Ms. Peat.**

wtk                                                                    109

1          So, whether this invitation was sent,

2     responding to any of that is actually irrelevant

3     because the meeting was never intended to deal with

4     any of the issues that were really a subject to

5     this complaint.

6          Finally, regardless of whether that

7     meeting was scheduled or held, it does not excuse

8     DCPS for their failure to do the evals that we are

9     requesting independently now.  That had nothing to

10    do with any meeting.

11          Finally, I think Ms. Clownam's testimony

12    regarding Rock Academy and it's ability to provide

13    educational benefit to Michael, speaks for itself.

14    Accordingly, we were asking for independent

15    evaluations of the ones listed above; interim

16    placement at Rock Creek; MDT meeting within 30 days

17    to revise the IEP and to discuss and determine

18    compensatory education.  Thank you.

19          HEARING OFFICER DuBOW: Ms. Puckett?

20          MS. PUCKETT: Yes, DCPS's position in this

21    is that placement in Rock Creek is not justified in

22    this case.  The Student was found eligible for

1  special-ed in August of '04.  So, we're here a **year**

2  later with a Student who is progressing.  The

3  grandmother acknowledged in a meeting in January

4  that he was progressing.

5          The special-ed coordinator testified **that**

6  he had made significant progress this school **year.**

7  She also testified that once she was aware that the

8  Parent had some concerns, she attempted to schedule

9  a meeting.  Now, there is three different versions

here today of, actually what happened.  Ms. Gregory

testified that she faxed the letter-of-invitation

and a letter, which is DCPS-1 and DCPS-2,

documentation with a fax confirmation that she knew

who the attorney was prior to this meeting and that

she knew what this proposed meeting date was going

to be.

        I don't know, I mean, if the allegation is

that DCPS came up with a document after the fact,

but the document is obviously dated June 10.  It

was faxed to Ms. Houck's office, That letter shows

that Ms. Gregory knew who the attorney was prior to

that meeting.  We attempted to have a **meeting for**

wtk                                                                    111

1  this Student to address the concerns.  Ms. Gregory

2  testified that there was nothing that she knew of

3     indicated that this student had behavior

4  issues to the point that he warranted a clinical

5  evaluation.

6          He's progressed this year, and we ask that

7  you find that there has been no denial of faith in

8  this situation.  The Student is progressing.  And,

9  although something might not have happened the way

10 it was supposed to happen, there is no educational

11 harm to this Student.

12         He doesn't have ESY services.  He's

13 progressing in his class work.  And I don't believe

14 at this time, a private placement is warranted.

15         HEARING OFFICER DuBOW: Thank you case is

16 submitted.  Next Case.

17         [Whereupon, the hearing was concluded.]

18                       - - -

112

# CERTIFICATE

I, hereby, certify that the tape recording represented by the foregoing pages was transcribed by me; and that the foregoing transcript is a correct and accurate record of the proceedings to the best of my knowledge, ability and belief.

*William T. Kennedy*

WILLIAM T. KENNEDY

TRANSCRIBER